758 F.2d 936
 53 USLW 2503, 12 Collier Bankr.Cas.2d 671,
12 Bankr.Ct.Dec. 1405, Bankr. L. Rep. P 70,346
 SCHWEITZER, Josephine, Appellant,
v.
CONSOLIDATED RAIL CORPORATION (CONRAIL) and the Reading Company.
SEIBERT, Mildred, Individually and as Executrix of the
Estate of Seibert, Paul D., Deceased, Appellant,
v.
CONSOLIDATED RAIL CORPORATION (CONRAIL) the Reading Company.
WENTZEL, George A., Appellant,
v.
CONSOLIDATED RAIL CORPORATION (CONRAIL) and the Reading Company.
Elaine SCHWAMBACH, Executrix of the Estate of Woodrow W.
Schwambach and Merlin Schwambach, Executor of that
Estate, Appellants,
v.
CONSOLIDATED RAIL CORPORATION (CONRAIL) and the Reading Company.
FRANK, Marilyn L., as Executrix of the Estate of Russell C.
Wennell, deceased, Appellant,
v.
CONSOLIDATED RAIL CORPORATION (CONRAIL) and the Reading Company.
SCHOLL, Martin H., Individually and as Executor of the
Estate of Ethel M. Scholl, deceased, Appellant,
v.
CONSOLIDATED RAIL CORPORATION (CONRAIL) and the Reading Company.
FENSTERMACHER, Earl R., and Scholing, Carl,
v.
CONSOLIDATED RAIL CORPORATION, a corporation, and the
Reading Company, a corporation
v.
ANCHOR PACKING COMPANY, Celotex Corporation,
successor-in-interest to Philip Carey Manufacturing Company,
Philip Carey Corporation, Briggs Manufacturing Company
and/or Panacon Corporation, Certainteed Corporation, Durox
Equipment Company, Garlock, Inc., Janos Industrial
Insulation Corporation, John Crane- Houdaille, Inc., J.W.
Roberts Ltd., Keene Corporation, Nicolet, Inc., Nosroc
Corporation, successor-in-interest to G. & W.H. Corson, Inc.
and Calcite Quarry Corporation, Studebaker-Worthington,
Inc., Tannetics, Inc., Turner & Newall PLC, Turner Asbestos
Fibers Ltd., Union Rubber, Inc. and Vellumoid Company,
Third-Party Defendants,
Eagle Picher Industries, Inc. and Flintkote Company.
Appeal of FENSTERMACHER, Earl R., in No. 84-1203.
Appeal of SCHOLING, Carl, in No. 84-1204.
Josephine SCHWEITZER, Mildred Seibert, Individually and as
Executrix of the Estate of Paul D. Seibert, Deceased, George
A. Wentzel, Elaine Schwambach, Executrix of the Estate of
Woodrow W. Schwambach, and Merlin Schwambach, Executor of
that Estate, Marilyn L. Frank, as Executrix of the Estate of
Russell C. Wennell, Deceased, Martin H. Scholl, Individually
and as Executor of the Estate of Ethel M. Scholl, Deceased,
v.
CONSOLIDATED RAIL CORPORATION (CONRAIL) and the Reading Company.
Appeal of CONSOLIDATED RAIL CORPORATION. (Two Cases)
Earl R. FENSTERMACHER and Carl Scholing
v.
CONSOLIDATED RAIL CORPORATION, a corporation, and the
Reading Company, a corporation
v.
ANCHOR PACKING COMPANY, Celotex Corporation,
successor-in-interest to Philip Carey Manufacturing Company,
Philip Carey Corporation, Briggs Manufacturing Company
and/or Panacon Corporation, Certainteed Corporation, Durox
Equipment Company, Garlock, Inc., Janos Industrial
Insulation Corporation, John Crane- Houdaille, Inc., J.W.
Roberts Ltd., Keene Corporation, Nicolet, Inc., Nosroc
Corporation, successor-in-interest to G. & W.H. Corson, Inc.
and Calcite Quarry Corporation, Studebaker-Worthington,
Inc., Tannetics, Inc., Turner & Newall PLC, Turner Asbestos
Fibers Ltd., Union Rubber, Inc. and Vellumoid Company,
Third-Party Defendants,
Eagle Picher Industries, Inc. and Flintkote Company.
In the Matter of the CENTRAL RAILROAD COMPANY OF NEW JERSEY, Debtor,
Consolidated Rail Corporation, Intervenor,
Andrew Thomas and Trudell Thomas, his wife, Appellants.
Appeal of Andrew THOMAS and Trudell Thomas, in No. 84-5293.
Appeal of CONSOLIDATED RAIL CORPORATION, Intervenor in No. 84-5310.
In the Matter of The CENTRAL RAILROAD COMPANY OF NEW JERSEY, Debtor,
Consolidated Rail Corporation, Intervenor*.
Appeal of Joseph PONGRAC, Sr., Robert A. Bingle, Alexander
Redelico and Evelyn Redelico, h/w, Joseph C. Popadick and
Elma Popadick, h/w, Edward Witos and Philomena Witos, h/w,
Mark Gammel, Harry Guralchuk, Steve Palichak, Joseph M.
Pinto, Frank Pongrac, Jr., John Sowizral, Harry Wilson,
George J. Zeblisky, Robert J.F. Brobyn, Richard Middleton
and any and all persons acting on their behalf.
 Nos. 84-1086 to 84-1089, 84-1108, 84-1132, 84-1203, 84-1204,
84-1116 to 84- 1121, 84-1160, 84-1194, 84-5295,
84-5310 and 84-5451.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 13, 1984.
Decided March 29, 1985.
Rehearing and Rehearing In Banc Denied in Nos. 84-5293,
84-5310 and 84-5451 April 26, 1985.
 
 Joseph F. Rice, James H. Rion, Blatt & Fales, Barnwell, S.C., Frederick W. Nabhan, Nabhan & Nabhan, Allentown, Pa., Richard H. Middleton, Jr., Middleton & Anderson, Savannah, Ga., Paul Pratt, P.C., James Murray Lynn, Stack & Gallagher, P.C., Philadelphia, Pa., Weiner, Ostrager, Fieldman & Zucker, c/o Bernard Chazen (argued), Englewood, N.J., Robert J.F. Brobyn, Brobyn & Forceno, P.C., Philadelphia, Pa., J. Michael Farrell, Camden, N.J., Thomas Parks Shearer (argued), Pittsburgh, Pa., Arthur R. Miller (argued), Harvard Law School, Cambridge, Mass., for appellants.
 
 
 1
 James D. Crawford (argued), Ralph G. Wellington, Margaret S. Woodruff, Bonnie R. MacDougal, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Bruce B. Wilson, Donald A. Brinkworth, D. Scott Morgan, Margaret W. Wiener, Consolidated Rail Corporation, Philadelphia, Pa., for Conrail.
 
 
 2
 Howard H. Lewis (argued), Alfred W. Hesse, Jr., Jeffrey S. Adler, Timothy I. McCann, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Reading.
 
 
 3
 Stanley Weiss (argued), Alexander Cohen, Carpenter, Bennett & Morrissey, Newark, N.J., for CNJ, CJI, and Timpany.
 
 
 4
 John H. Lewis, Jr., William E. Zeiter, Richard F. McMenamin, William H. Clark, Jr., Annemiek N. Young, Morgan, Lewis & Bockius, Philadelphia, Pa., Robert J. Siverd, David A. Bernat, The Penn Central Corporation, Greenwich, Conn., for amicus, Penn Central.
 
 
 5
 Before SEITZ, GARTH, and HIGGINBOTHAM, Circuit Judges.
 
 OPINION OF THE COURT
 
 6
 SEITZ, Circuit Judge.
 
 
 7
 These appeals, in the various procedural postures set forth in Part I, infra, call upon us to interpret Sec. 77 of the Bankruptcy Act of 1898 ("section 77"), as amended, formerly codified at 11 U.S.C. Sec. 205 (repealed 1978). Among the questions presented is whether a plaintiff in an asbestos-related personal injury action who had no manifest injury prior to the consummation date of his employer's reorganization in bankruptcy had a dischargeable "claim" within the meaning of section 77.
 
 I.
 
 8
 Former railroad workers, representatives and survivors brought tort actions against The Reading Company ("Reading") and other defendants in the United States District Court for the Eastern District of Pennsylvania pursuant to the Federal Employers' Liability Act, 45 U.S.C. Sec. 51 et seq. (1982) ("F.E.L.A."). Subject matter jurisdiction existed pursuant to 28 U.S.C. Sec. 1331 (1982) and 45 U.S.C. Sec. 56 (1982).
 
 
 9
 Reading filed motions in each action to dismiss it as a party. These motions were opposed by plaintiffs and Consolidated Rail Corporation ("Conrail"), co-defendant in each of these actions. The motions were granted, 36 B.R. 469, express determinations were made that there was no just reason for delay, and, pursuant to Fed.R.Civ.P. 54(b), final judgments were entered in favor of Reading in each action. Plaintiffs and Conrail filed timely notices of appeal. This court has jurisdiction to review the judgments pursuant to 28 U.S.C. Sec. 1291 (1982).
 
 
 10
 In addition, tort actions were brought in federal court against Central Jersey Industries, Inc. ("CJI") by former employees of Central Railroad Company of New Jersey ("CNJ") and their spouses pursuant to F.E.L.A. One similar action was brought in a New Jersey state court. In response to these actions, CJI filed two separate petitions for relief in the United States District Court for the District of New Jersey. That court had presided over CNJ's reorganization under section 77. The district court had retained jurisdiction to consider such petitions in accordance with its equitable power "to secure or preserve the fruits and advantages of a judgment or decree entered therein." Local Loan Co. v. Hunt, 292 U.S. 234, 239, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934). In one petition, CJI sought a declaration that the state court action was barred. It also sought an injunction seeking: (1) to restrain plaintiffs from prosecuting that action against CNJ, CJI, and Robert D. Timpany and (2) to require plaintiffs to dismiss as to those defendants. The second petition requested similar relief with respect to the federal court actions and, in addition, sought to restrain other former employees from commencing actions.
 
 
 11
 Conrail sought intervention to oppose the petition seeking relief against the state court plaintiffs, and the district court permitted intervention. The court then granted both of CJI's petitions and entered judgments to that effect. Timely notices of appeal were filed and this court granted a motion to stay the district court's injunction insofar as it enjoined the commencement of new actions and insofar as it ordered that the existing actions in federal court be dismissed. Appellate jurisdiction exists to review these judgments pursuant to 28 U.S.C. Sec. 1291 (1982). See Ex Parte Tiffany, 252 U.S. 32, 40 S.Ct. 239, 64 L.Ed. 443 (1920).
 
 II.
 
 12
 Reading and CNJ operated railroads before they reorganized in bankruptcy and divested themselves of their rail assets. Reading filed its bankruptcy petition on November 23, 1971, and transferred all of its rail assets to Conrail on April 1, 1976. The consummation date of Reading's reorganization was December 31, 1980. CNJ filed its petition on March 12, 1967, transferred its rail assets on April 1, 1976, and the consummation date of its reorganization was September 14, 1979. Robert D. Timpany was the trustee of CNJ's assets during its reorganization. CJI is the company that resulted from that reorganization.
 
 
 13
 Subsequent to the consummation dates, a number of actions were brought against Reading, CNJ, CJI, and Timpany ("defendants"), alleging personal injury to former employees of Reading and CNJ as a result of exposure to asbestos in the course of their work for the railroads. Plaintiffs in those actions include former railroad employees, representatives, survivors, and spouses ("plaintiffs"). Plaintiffs allege that the asbestos-related injuries did not become manifest until after the relevant consummation dates. It is undisputed that, at this stage in the proceedings, plaintiffs' allegations must be accepted as true.
 
 
 14
 Defendants argued that plaintiffs' claims were discharged in the bankruptcy proceedings. Plaintiffs and Conrail argued, however, that these claims were not discharged. Further, they argued that those claims did not arise until after the consummation dates and that section 77 does not provide for discharge of such claims. They also argued that if section 77 did provide for discharge in these circumstances, it would violate due process. The district courts determined that plaintiffs' claims were properly discharged, and plaintiffs and Conrail appealed.
 
 III.
 
 15
 Section 77(b) in pertinent part provides that a plan of reorganization "shall include provisions modifying or altering the rights of creditors." "Creditors" include "all holders of claims of whatever character against the debtor or its property, whether or not such claims would otherwise constitute provable claims under this [Act]." "Claims" include "debts, whether liquidated or unliquidated ..., or other interests of whatever character." 11 U.S.C. Sec. 205(b) (repealed 1978).
 
 
 16
 Section 77(f) provides that confirmation of the reorganization plan is binding upon "all creditors secured or unsecured, whether or not adversely affected by the plan, and whether or not their claims shall have been filed, and, if filed, whether or not approved, including creditors who have not, as well as those who have, accepted it." Moreover, if the plan so provides,
 
 
 17
 [t]he property dealt with by the plan, when transferred and conveyed to the debtor or to the other corporation or corporations provided for by the plan, or when retained by the debtor pursuant to the plan, shall be free and clear of all claims of the debtor, its stockholders and creditors, and the debtor shall be discharged from its debts and liabilities.
 
 
 18
 11 U.S.C. Sec. 205(f) (repealed 1978).
 
 
 19
 The quoted statutory language clearly provides broad authorization for the discharge in bankruptcy of claims against the debtor in order to secure a fresh start for a company resulting from a section 77 reorganization. It is equally clear that plaintiffs' rights only could have been affected by the discharge of all "claims" against their employer if they had "claims" within the meaning of section 77 prior to the consummation date of their employer's reorganization.
 
 
 20
 The district courts in these cases were presented with the difficult question of whether plaintiffs, who allege that they were exposed to asbestos prior to their employer's reorganization and did not manifest any injury until after the relevant consummation dates, had "claims" that were discharged in the reorganization proceedings. The courts concluded in the affirmative, necessarily relying for this conclusion on the determination that plaintiffs did have dischargeable "claims" within the meaning of section 77. We shall now consider whether this determination was error.
 
 
 21
 The starting point for our analysis is the rule that a bankruptcy claim must be based on state or federal law that, "wholly apart from bankruptcy," creates substantive obligations. Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 170, 67 S.Ct. 237, 243, 91 L.Ed. 162 (Frankfurter, J., concurring). See Tate v. National Acceptance Company (In re Leeds Homes, Inc.), 332 F.2d 648, 649-50 (6th Cir.1964), cert. denied, 379 U.S. 836, 85 S.Ct. 71, 13 L.Ed.2d 43 (1964). Since plaintiffs' personal injury actions arise under F.E.L.A., any "claims" plaintiffs may have had prior to the consummation dates would have been based on the federal tort law provided pursuant to that statute.
 
 
 22
 It is undisputed that a cause of action in tort is a "claim" pursuant to section 77 so that if plaintiffs had causes of action that existed under F.E.L.A. prior to the relevant consummation dates they had "claims." Thus, taking as true plaintiffs' allegations that injury did not manifest until after the consummation dates, we must initially consider whether plaintiffs' F.E.L.A. claims existed before those dates.
 
 
 23
 Plaintiffs suggest that the United States Supreme Court's decision in Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) mandates the conclusion that these actions did not exist until injury became manifest. Urie held that, for statute of limitations purposes, a F.E.L.A. action for personal injury resulting from the inhalation of silica dust accrues when silica-related injury manifests itself. Defendants do not agree that Urie controls. Assuming that the Urie rule is applicable to injury resulting from the inhalation of asbestos fibers, they argue that a cause of action may "exist" before it has "accrued" for statute of limitations purposes. See In re UNR Industries, Inc., 725 F.2d 1111, 1119 (7th Cir.1984), dismissing appeal from, 29 B.R. 741 (D.C.N.D.Ill.1983) (dicta suggesting that certain asbestos-related causes of action may "exist" before they "accrue").
 
 
 24
 We assume, without deciding, that under certain circumstances a cause of action may withstand a motion to dismiss for failure to state a claim though the action has not "accrued" within the meaning of the relevant statute of limitations and, thus, a cause of action may "exist" before it has "accrued." Nevertheless, there is generally no cause of action in tort until a plaintiff has suffered identifiable, compensable injury. A leading treatise on tort law explains:
 
 
 25
 Actual loss or damage resulting to the interests of another [is a necessary element of a negligence cause of action].... The threat of future harm, not yet realized, is not enough. Negligent conduct in itself is not such an interference with the interests of the world at large that there is any right to complain of it, or to be free from it, except in the case of some individual whose interests have suffered.
 
 
 26
 W. Prosser and P. Keeton, Prosser and Keeton on Torts (5th ed.1984) at 165 (footnotes omitted).
 
 
 27
 It is true that the possible existence of subclinical asbestos-related injury prior to manifestation may be of interest to a histologist. See Insurance Company of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1218 (6th Cir.1980), clarified 657 F.2d 814 (6th Cir.1981), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). Likewise, the existence of such injury may be of vital concern to insurers and their insureds who have bargained for liability coverage triggered by "bodily injury." See id. We believe, however, that subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.
 
 
 28
 Moreover, we are persuaded that a contrary rule would be undesirable as applied in the asbestos-related tort context. If mere exposure to asbestos were sufficient to give rise to a F.E.L.A. cause of action, countless seemingly healthy railroad workers, workers who might never manifest injury, would have tort claims cognizable in federal court. It is obvious that proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for those who do. Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purpose of tort law: the compensation of victims who have suffered. Therefore we hold that, as a matter of federal law, F.E.L.A. actions for asbestos-related injury do not exist before manifestation of injury.
 
 
 29
 Still, it has been held that, under certain circumstances, a person may hold a "contingent" claim and thereby be a "creditor" within the meaning of the Bankruptcy Act, even though he presently has no cause of action against the debtor. See In re Radio-Keith-Orpheum Corporation, 106 F.2d 22, 26-27 (2d Cir.1939) (applying section 77B of the Bankruptcy Act, formerly codified at 11 U.S.C. Sec. 205 (repealed in 1978)). This proposition follows from the broad language of section 77(b) which provides that "claims" include "interests of whatever character."
 
 
 30
 In Radio-Keith-Orpheum, landlords had leased property to one of the debtor's subsidiaries on guaranties by the debtor that the rent would be paid. The landlords argued that, because there had been no default under the leases, the guaranties should be unaffected by the bankruptcy proceedings. The Second Circuit rejected this argument. Applying a definition of "creditor" that, for present purposes, is virtually identical to the one found in section 77, the court treated the landlords as creditors. It held that they "were not as a matter of law entitled to stand aloof and obtain a continuance of the guaranties unaffected by the reorganization, the equivalent of a preference for them over unsecured creditors with accrued or determinable claims. What they were entitled to was treatment as nearly like that accorded to ordinary unsecured creditors as the circumstances permitted...." Id.
 
 
 31
 The reasoning in Radio-Keith-Orpheum is not controlling here, however, because we do not believe plaintiffs had "interests" of any character before injury manifested itself. In our view, before one can have an "interest" which is cognizable as a contingent claim under section 77, one must have a legal relationship relevant to the purported interest from which that interest may flow. Cf. Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.), 744 F.2d 332 (3d Cir.1984) (no contingent claim pursuant to 11 U.S.C. Sec. 101(4) (1982) unless a "right to payment" or a "right to an equitable remedy" exists).
 
 
 32
 In Radio-Keith-Orpheum, although there had been no breach of the lease agreement and thus there was no present cause of action pursuant to the guaranties, there was a guarantor-guarantee legal relationship from which an interest in the guaranty could flow. There is no legal relationship, however, between a tortfeasor and a tort victim until a tort actually has occurred. The tortfeasor-victim legal relationship arises simultaneously with the cause of action in tort. Since we have said that there is no tort under F.E.L.A. until injury manifests itself, it follows that there was no legal relationship between plaintiffs and defendants relevant to plaintiff's future causes of action in tort from which an "interest" could flow.
 
 
 33
 A number of factors lend support to this analysis. First, defendants have not cited a single opinion, other than those of the district courts in these cases, holding that a tort cause of action as yet nonexistent under applicable tort law is a contingent claim within the meaning of any section of the Bankruptcy Act or Bankruptcy Code. Second, the fairness rationale in Radio-Keith-Orpheum is inapplicable in the tort context. One who contracts with a debtor prior to reorganization bargains for a legal relationship with that debtor, relying on the debtor's pre-reorganization solvency. We agree that such a person should not be "entitled to stand aloof" and avoid the consequences of the bankruptcy proceedings. Id. In contrast, a tort plaintiff cannot in any reasonable way be said to have bargained for his cause of action.
 
 
 34
 Third, a construction of "interest" that would include the future possibility of a tort cause of action against a debtor with whom the future victim has no legal relationship relevant to the purported "interest" would lead to results that we cannot believe were intended by Congress. Reading's treatment in its brief of Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft, Inc.), 730 F.2d 367, 375 (5th Cir.1984) illustrates this point.
 
 
 35
 The Mooney court, interpreting Chapter VII of the Bankruptcy Act of 1898, formerly codified at 11 U.S.C. Sec. 101 et seq. (repealed 1978), held that persons killed in an airplane crash five years after the close of the airplane manufacturer's bankruptcy proceedings did not have dischargeable "claims" against the debtor in the prior proceedings. Reading argues in its brief that the broad definition of "claims" in section 77, including "interests of whatever character," would mandate a contrary result under the Mooney facts. Thus, in Reading's view, a person who had no inkling that years in the future he would be killed by a product produced by the debtor would be required to file a claim in the debtor's section 77 bankruptcy proceedings so as to preserve any rights that he might have in a future tort suit. One court has already described such a procedure as "absurd." Gladding Corp. v. Forbes (In re Gladding Corp.), 20 B.R. 566, 568, (Bkrtcy.D.Mass.1982). We agree. It would be nearly as absurd under our facts to have expected plaintiffs, who allegedly had manifested no injury at the time of the reorganization proceedings, to file claims for such injury in those proceedings.
 
 
 36
 Finally, an interpretation of "interests" that included plaintiffs' future tort actions would raise constitutional questions. For example, the general rule is that all known creditors must receive personal notice. See, e.g., Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 318-20, 70 S.Ct. 652, 659-60, 94 L.Ed. 865 (1950). This requirement has proven to be manageable where creditors have a present legal relationship with the debtor, such as in the Radio-Keith-Orpheum case. But if contingent claims were held to include possible future tort claims, then every hypothetical chain of future events leading to liability, regardless of how likely or unlikely, might be the basis for a contingent claim. The holder of any such "claim" whose whereabouts were known would then seem to be a "known creditor." Thus, in our case, every employee who had worked near asbestos and whose address was known would be a known creditor; yet none received personal notice in the prior reorganization proceedings. We believe that our interpretation, which avoids such thorny constitutional issues, is the proper view of Congressional intent.
 
 
 37
 We conclude, therefore, that plaintiffs' future F.E.L.A. causes of action were not dischargeable claims under section 77, and that the district courts erred in determining otherwise.[1] Our disposition of this issue makes it unnecessary for us to reach plaintiffs' alternative arguments.
 
 IV.
 
 38
 CJI and Reading have presented additional contentions to this court. CJI contends that the plaintiffs in the state court action and intervenor Conrail in that action are collaterally estopped from arguing that their rights against it were not discharged. Reading contends that plaintiffs' causes of action cannot be asserted against the reorganized Reading Company because plaintiffs' alleged injuries were caused by a wholly different entity: the former Reading Company. The legal basis for Reading's argument is not clear. On the one hand, Reading appears to argue that, as a matter of bankruptcy law, a section 77 reorganization proceeding necessarily results in an entity that is wholly distinct from the debtor. On the other hand, Reading's argument may be that, pursuant to the corporate law under which Reading is organized, it cannot be held liable for plaintiffs' claims because it is neither the same entity as the former Reading Company nor a successor corporation.
 
 
 39
 We do not address these arguments on the merits because they have not yet been considered by the district courts. Nor for the same reason do we consider any possible recovery against Mr. Timpany, as Trustee. The defendants will be afforded an opportunity to make their arguments before those courts on remand.
 
 
 40
 The judgments of the district courts will be reversed and the cases remanded for further proceedings consistent with this opinion.
 
 
 
 *
 Our reading of the record indicates that Consolidated Rail Corporation is not a party in No. 84-5451
 
 
 [1]
 Thus, we reject the argument made by Reading and CJI that the plaintiffs had claims that were discharged by the express terms of their respective plans. Because this case does not present the question of what provision in a reorganization plan, if any, could be made for future claims such as these (e.g., reserve or sinking funds, insurance, annuities, etc.), we do not address that issue here